**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| FEDS FOR MEDICAL FREEDOM, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 3:21-cv-356 |
| | ) |
| JOSEPH R. BIDEN, JR., et al., | ) |
| | ) |
| *Defendants*. | ) |

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.    Plaintiffs Are Likely To Succeed On The Merits ........................................... 1

        A.   The CSRA Does Not Preclude Review ............................................... 1

        B.   Plaintiffs' Claims Are Ripe ................................................................ 4

        C.   Plaintiffs Are Likely To Prevail On Their *Ultra Vires* Claims ...................... 6

        D.   Plaintiffs Are Likely To Prevail On Their APA Claims ............................... 14

    II.   Plaintiffs Will Suffer Imminent, Irreparable Harm Absent Relief ...................... 17

    III.  The Public Interests And Equities Weigh In Favor Of Plaintiffs ........................ 18

    IV.  Relief Should Be Universal ................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*AFGE v. Sec'y of Air Force,* 716 F.3d 633 (D.C. Cir. 2013) ............................ 4

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)..................................................... 5

*Ala. Ass'n of Realtors v. HHS,* 141 S. Ct. 2485 (2021)..................................... 19

*Am. Fed'n of Gov't Emps. v. FLRA*, 794 F.2d 1013 (5th Cir. 1986) ................ 2

*Benisek v. Lamone,* 138 S. Ct. 1942 (2018) .................................................... 19

*Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982) ............................................ 2

*BST Holdings, L.L.C. v. OSHA,* 17 F.4th 604 (5th Cir. 2021) ...........7, 9, 16, 17

*Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) .............................................. 18

*Chamber of Commerce of U.S. v. Reich,* 74 F.3d 1322 (D.C. Cir. 1996) ......... 6

*DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891 (2020)........................ 10

*Elgin v. Treasury*, 567 U.S. 1 (2012) ............................................................... 4

*FLEOA v. Cabaniss,* No. 1:19-cv-735, 2019 WL 5697168 (D.D.C. Nov. 4, 2019) .......... 4

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) ............................................. 4

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477
   (2010) ............................................................................................... 7, 8

*Georgia v. Biden*, ___ F. Supp. 3d ___, 2021 WL 5779939
   (S.D. Ga. Dec. 7, 2021)........................................................................11, 20

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) .................................... 20

*Hampton v. Wong,* 426 U.S. 88 (1976) ........................................................... 15

*In re MCP No. 165*, 20 F.4th 264 (6th Cir. 2021)...............................7, 10, 14

*Industrial Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980)............. 14

*Kentucky v. Biden*, ___ F. Supp. 3d ___, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) . 11

*Kentucky v. Biden*, ___ F.4th ___, 2022 WL 43178 (6th Cir. Jan. 5, 2022) ...7, 8, 9, 12, 19

*Louisiana v. Becerra,* 20 F.4th 260 (5th Cir. 2021) ....................................... 20

*McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992) .............................................. 2

*Missouri v. Biden*, ___ F. Supp. 3d ___,
   2021 WL 5564501 (E.D. Mo. Nov. 29, 2021) ....................................... 16

*Myers v. United States*, 272 U.S. 52 (1926) .................................................... 8

*NFIB v. OSHA*, No. 21A244 (Jan. 7, 2022) ................................................6, 19

*NFFE v. Weinberger*, 818 F.2d 935 (D.C. Cir. 1987) ...............................3, 4, 15

*NTEU v. Bush*, 891 F.2d 99 (5th Cir. 1989) ...................................................... 2

*NTEU v. Devine*, 733 F.2d 114 (D.C. Cir. 1984) ............................................. 3

*NTEU v. Horner*, 854 F.2d 490 (D.C. Cir 1988) ............................................. 3

*Rodden v. Fauci,* 3:21-cv-317, 2021 WL 5545234 (S.D. Tex. Nov. 27, 2021) .1, 5, 17, 20

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ....................................18, 19

*Rollins v. Marsh*, 937 F.2d 134 (5th Cir. 1991) ............................................. 2

*State v. Nelson*, No. 8:21-CV-2524, ___ F. Supp. 3d ___, 2021 WL 6108948 (M.D. Fla. Dec. 22, 2021) ................................................................................... 11

*Texas v. Becerra*, No. 2:21-CV-229, ___ F. Supp. 3d ___, 2021 WL 5964687 (N.D. Tex. Dec. 16, 2021) ........................................................ 16

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ............................................. 16

*Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047 (5th Cir. 1997) ...................... 18

## Regulations, Statutes, and Executive Orders

62 Fed. Reg. 43451........................................................................................... 13

77 Fed. Reg. 24339........................................................................................... 13

5 U.S.C. § 3301 .........................................................................................10, 11, 15

5 U.S.C. § 3302 ..............................................................................3, 4 10, 11, 12

5 U.S.C. § 7301 .........................................................................................10, 12, 13

Fed. R. Civ. P. 65 ............................................................................................ 20

Pub.L. 100-71, Title V, 101 Stat. 468 (1987) .................................................. 13

Pub.L. 103-329, Title VI, 108 Stat. 2432 (1994) ............................................ 13

Pub.L. 104-52, Title VI, 109 Stat. 502 (1995) ................................................ 13

Pub.L. 104-208, 110 Stat. 3009 (1996) ........................................................... 13

Pub.L. 115-271, Title VIII, 132 Stat. 4105 (2018) ......................................... 13

Pub.L. 105-61, Title VI, 111 Stat. 1313 (1997) .............................................. 13

Pub.L. 105-261, Div. A, Title XI, 112 Stat. 2142 (1998)................................. 13

Pub.L. 105-277, 112 Stat. 2681 (1998) ........................................................... 13

**Other Authorities**

Alex Gangitano & Morgan Chalfant, *Federal Agencies Prepare to Act Against Unvaccinated Employees*, THE HILL, https://thehill.com/homenews/administration/588836-federal-agencies-prepare-to-act-against-unvaccinated-employees (Jan. 9, 2022) ..........................................17, 19

## INTRODUCTION

These are extraordinary times—but that is when the rule of law matters most. Plaintiffs have demonstrated that they are likely to prevail on their claims, that they will suffer imminent and irreparable harm, and the balance of interests favors an injunction.

## ARGUMENT

### I.     Plaintiffs Are Likely To Succeed On The Merits.

In their opening brief, Plaintiffs made a strong showing that Defendants lack authority to issue the Mandates, let alone the clear authority required under several clear-statement doctrines, and that the Mandates also violate the APA.[1] The Court should reject the government's arguments in response.[2]

### A.     The CSRA Does Not Preclude Review.

The government first tries to preclude review altogether by insisting that, because some Plaintiffs point to imminent discipline as evidence of irreparable harm, this case must involve individualized employment disputes that can be heard only through the strictures of the Civil Service Reform Act. Opp. 8–12. For nearly 40 years, courts have rejected the government's argument in cases like this one where plaintiffs challenge newly-issued, generally-applicable agency policies, even those involving employment in some fashion.

---

[1] Pursuant to the Court's statements at the January 4, 2022, status conference, Plaintiffs focus their attention on the Employee Mandate. Plaintiffs' challenges overlap a fair bit, and thus throughout this brief, Plaintiffs often refer to the "Mandates" to cover both the Employee Mandate and the Contractor Mandate.

[2] The government's brief includes a footnote listing prior cases declining to issue preliminary relief, Opp. 1 n.1, but the government elides that almost none of those cases raised the same claims as here, nor does the government acknowledge many cases had obvious foot-faults like forgetting to sue the proper defendant. *See, e.g.*, *Rodden v. Fauci*, No. 3:21-cv-317, 2021 WL 5545234 (S.D. Tex. Nov. 27, 2021).

1

The Fifth Circuit has long held that courts have jurisdiction over challenges to new federal employment regulations of *general applicability*. A famous example is when President Reagan issued an EO requiring random drug testing of certain civil employees. The Fifth Circuit *expressly* authorized suits "against the individual agency plans implementing the [Executive] Order." *NTEU v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989). That is precisely what Plaintiffs have done here: challenge the agency policies implementing EO14043. That one case settles the matter. Nor is it an outlier. In another case where a union tried an unusual route of challenging a "government-wide regulation promulgated by the Office of Personnel Management," the Fifth Circuit made clear how such challenges *should* be brought: if a plaintiff "wishes to challenge the validity of this [federal employment] regulation, there are other means available," such as "challenging [the] regulations in district court." *Am. Fed'n of Gov't Emps. v. FLRA*, 794 F.2d 1013, 1015–16 (5th Cir. 1986).

The government does not cite either of these binding cases. But it does cite several cases that are easily distinguishable because each involved challenges to *individualized* employment actions, not general agency regulations. Opp. 8, 10. For example: (1) *Rollins v. Marsh*, 937 F.2d 134 (5th Cir. 1991), involved two employees' disciplinary action for publishing nude photos; (2) *Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982), involved a single employee's reassignment; and (3) *McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992), involved a single employee's termination for unsatisfactory performance.

The D.C. Circuit has long made the key distinction between individualized and

2

generally applicable challenges in this area. For example, in the course of invalidating a new employment regulation issued pursuant to 5 U.S.C. § 3302, the court held that judicial review of "minor personnel actions" is barred by CSRA, but here "we are confronted with a major policy decision" that affects "thousands of government employees"—a number that pales in comparison to the Employee Mandate—and thus is not within the CSRA. *NTEU v. Horner*, 854 F.2d 490, 497 (D.C. Cir. 1988). Another decision emphatically rejected as "meritless" the idea that the CSRA "impliedly precludes preenforcement judicial review of rules" imposing "dramatic changes in federal personnel practices relating to reduction in force procedures, performance management systems, and pay administration." *NTEU v. Devine*, 733 F.2d 114, 115, 117 n.8 (D.C. Cir. 1984).

Perhaps most on point is a case where a union and employee brought APA and constitutional claims against DOD's policy implementing President Reagan's above-discussed EO requiring random drug testing of civil employees. The D.C. Circuit held that "the government had *no legal basis* for making th[e] argument" that the district court lacked jurisdiction due to "the exclusive jurisdictional provisions of the Civil Service Reform Act." *NFFE v. Weinberger*, 818 F.2d 935, 939–40 (D.C. Cir. 1987). In fact, the argument "is completely baseless." *Id.* at 940.

The D.C. Circuit even warned the government: "To discourage any future litigant who might have the effrontery to engage the District Court with this discredited theory of subject matter jurisdiction, we briefly review the law of this circuit for what we trust will be the last time." *Id.* at 940. The court held that the CSRA did not preclude the APA or

constitutional claims challenging the agency's new policy implementing the EO. *See id.* at 941 n.11. The court also rejected the theory that "exhaustion of administrative remedies" was required (contrary to the government's argument for certain employees here, Opp. 10 n.5). 818 F.2d at 940. The bottom line: "the District Court's federal question jurisdiction extends to the subject matter of this dispute, and … the court has the power to grant the equitable relief requested" (*i.e.*, a preliminary injunction). *Id.* at 941–42.[3]

In sum, courts have authorized challenges to agencies' newly-implemented, generally-applicable employment policies, but not individualized employment disputes.[4]

As the Complaint here says several times, "Plaintiffs do not challenge individual employment decisions in this suit." Compl. ¶¶ 13, 160. Nor do Plaintiffs ultimately seek individualized employment relief—rather, they seek declaratory and injunctive relief against agency policies and EO14043. The CSRA thus does not preclude review here.

### B.    Plaintiffs' Claims Are Ripe.

The government throws in a makeweight argument that because *some* Plaintiffs have pending exemption requests, the Court should deny relief across the board. Opp. 12–

---

[3] The government also cites *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005), *see* Opp. 11–12, but it is distinguishable on the same basis as the government's Fifth Circuit decisions. As one court aptly held: "Unlike what plaintiffs claimed in *Fornaro*, NTEU does not challenge any personnel decisions or benefits determinations made in individual cases, and instead asserts that the OPM's promulgation of the FCIP regulation was arbitrary and an abuse of discretion in violation of 5 U.S.C. § 3302 and § 3304…. NTEU's requested relief would prohibit further use of the FCIP regulation, but does not seek individual relief for specific employee claims. The CSRA does not preclude this type of rulemaking challenge under the APA." *NTEU v. Whipple*, 636 F. Supp. 2d 63, 69 (D.D.C. 2009).

[4] Nor is there any doubt that these decisions survived *Elgin v. Treasury*, 567 U.S. 1 (2012). *See, e.g., FLEOA v. Cabaniss,* No. 1:19-cv-735, 2019 WL 5697168, at *6 (D.D.C. Nov. 4, 2019) (distinguishing *Elgin* and other cases cited by the government here, like *AFGE v. Sec'y of Air Force*, 716 F.3d 633 (D.C. Cir. 2013)).

13. Of course, there are many Plaintiffs whom the government tacitly agrees have *not* sought exemption requests, PI Exs. 15, 16, 17, 18, 20, 22, 23, 24, 25, 26, 27, 28, 29, 32, 37, 38, and the disciplinary process has begun for many of them, PI Exs. 15, 16, 17, 18, 20, 26, 27, 28, 29, 37, 38. This Court has already indicated that such individuals "appear" to face irreparable harm, meaning their claims certainly meet the much-lower threshold of ripeness. *Rodden*, 2021 WL 5545234, at *2. The government says these Plaintiffs "may" seek exemptions in the future. Opp. 12. But most of them have submitted unrebutted affidavits saying they will not do so. PI Exs. 15, 16, 17, 18, 20, 22, 23, 25, 26. In any event, it is odd for the government to argue a lack of ripeness by speculating that an injury might go away in the future.

There is also reason to doubt the government's claim that others are not facing harm. Plaintiff Michael Schaecher was mistakenly issued a 30-day notice of termination, which the government rescinded only because of this lawsuit, but then his agency later told him—mistakenly, as well—that the "order for termination has not been changed." Gov't Ex. 18 ¶¶ 5–6. And at least three members of Feds for Medical Freedom with pending exemption requests were sent notices of proposed suspensions. PI Exs. 34, 35, 36. Although the government claims those were also mistaken and rescinded, Gov't Ex. 19, that is beside the point: the government is clearly moving against employees with pending exemption requests, and the government cannot avoid review "simply by ending its unlawful conduct" every time Plaintiffs point it out. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

### C.  Plaintiffs Are Likely To Prevail On Their *Ultra Vires* Claims.

Plaintiffs persuasively demonstrated in their opening brief that EO14043 and the agency policies implementing it are *ultra vires* and should be declared illegal and enjoined.

The government responds by again trying to avoid judicial review altogether, insisting that the *ultra vires* cause of action recognized in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), applies only when there is a direct violation of another statute. Opp. 26 n.13. But *Reich* itself held the opposite: "[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President claims that he is acting pursuant to the Procurement Act in the pursuit of governmental savings. Yet this is what the government would have us do. Its position would permit the President to bypass scores of statutory limitations on governmental authority, and we therefore reject it." *Id.* at 1332. Moreover, as the government knows, nearly every court to enjoin various federal vaccine mandates has relied at least in part on *ultra vires* causes of action.

This Court should likewise reject the government's view and hold, for the reasons below, that Plaintiffs are likely to prevail on their *ultra vires* claims. As Chief Justice Roberts asked the government during the OSHA argument: "[T]his has been referred to, the approach, as a workaround, and I'm wondering what it is you're trying to work around." Oral Argument Transcript 79, *NFIB v. OSHA*, No. 21A244 (Jan. 7, 2022). The answer is that the government is trying to "work around" the absence of authority.

### 1. There Is No Inherent Article II Power To Forcibly Vaccinate Federal Employees.

On the merits, the government argues that the President has "inherent authority under Article II" to mandate vaccines for federal employees, Opp. 30—and even insists that Article II provides this power in "unmistakable terms," Opp. 28. This view of Article II power is unpersuasive in light of the Fifth Circuit's decision in *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021), which rejected a similar argument in the context of OSHA's vaccine mandate, *id.* at 618 ("Nor can the Article II executive breathe new power into OSHA's [statutory] authority.").

Even setting aside *BST*, the government's argument lacks merit. Conspicuously missing from the government's brief is an example of any President in the Nation's history who invoked the power to impose medical procedures on federal employees. Chief Judge Sutton, joined by seven of his colleagues, has provided an exhaustive historical review demonstrating that no branch of the federal government has asserted such power. *See In re MCP No. 165*, 20 F.4th 264, 289 (6th Cir. 2021) (Sutton, C.J., dissenting, joined by Kethledge, Thapar, Bush, Larsen, Nalbandian, Readler, and Murphy, JJ.). "The dearth of analogous historical examples is strong evidence that [the provision] does not contain such a power," especially given that "the threat of absenteeism is hardly unique to COVID-19." *Kentucky v. Biden*, ___ F.4th ___, 2022 WL 43178, at *15 (6th Cir. Jan. 5, 2022).

The government says that line employees' refusal to confirm their vaccinated status interferes with the President's "executive power." Opp. 26. For support, the government cites *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477

(2010), but Plaintiffs are not "'Officers of the United States' who exercise significant authority pursuant to the laws of the United States," *id.* at 486 (alteration omitted), and moreover *Free Enterprise* says that "[n]othing in our opinion … should be read to cast doubt on the use of what is colloquially known as the civil service system within independent agencies," *id.* at 507. That holding dates back to the Supreme Court's seminal decision in *Myers v. United States*, 272 U.S. 52 (1926), which rejected the notion that the President has constitutional authority over employees of "inferior offices," as those employees are controlled by Congress via the Civil Service Reform Act. *Id.* at 173. The Court held that while the President had constitutional power to "remov[e] executive officers of the United States whom he has appointed by and with the advice and consent of the Senate," *id.* at 106, by contrast "the merit system rests with Congress," *id.* at 174.

Moreover, the consequences of the government's argument are frightening: the President could invoke Article II to order every federal employee to undergo unwanted surgeries, ingestion of experimental medications, or almost anything else. *See Kentucky*, ___ F.4th ___, 2022 WL 43178, at *15 (asking "[w]hat is the logical stopping point of that power," which would amount to "a *de facto* police power [of] the President"). And because this is allegedly a constitutional power, presumably not even Congress could overrule it. That is not the "unitary executive"—it is a monarchy.

Unless Congress gave Defendants the power to impose the Mandates, they are *ultra vires*. As demonstrated next, Congress did not hand over such power to the Executive.

### 2.   There Is No Statutory Authority For The Mandates, Especially Given The Clear-Statement Canons.

As Plaintiffs argued in their opening brief, the Mandates are invalid unless there is "clear" statutory authority for them. This requirement derives from three independent canons requiring clear statements when Congress hands the Executive the power to take (1) significant economic and political actions, (2) actions that infringe on areas of traditional state authority, and (3) actions that approach the limit of Congress's powers.

The government says the Mandates do not involve questions of vast economic and political significance, Opp. 28, but that falls flat because the government simultaneously alleges that imposing the Mandates is important to protect the "millions" of federal employees and the critical important "aspects of the government's work," Opp. 37, 38. The government cannot have it both ways. *Kentucky*, ___ F.4th ___, 2022 WL 43178, at *14.

The government next contends that mandating vaccines for millions of people does not raise significant federalism concerns. Opp. 29. But the Fifth Circuit held that "to mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power." *BST*, 17 F.4th at 617. That controls here. By claiming the inquiry is different when those millions of people are part of the "federal workforce," Opp. 29, the government "frames the issue at the wrong level of generality," *Kentucky*, ___ F.4th ___, 2022 WL 43178, at *16. The government erroneously focuses solely on the group targeted, not the action taken. It "certainly" implicates the federalism clear-statement canon "when the federal government seeks to usurp [the States'] roles by doing something that it has no traditional prerogative to do—deploy [regulations] to mandate an irreversible medical

procedure." *Id.* If the government were right, federal employees would be little more than the President's chattel, even in areas of traditional State regulation like marriage, divorce, and landlord/tenant law.

The government also contends that these clear-statement doctrines apply only when the government invokes *Chevron* deference, Opp. 28, but as Chief Judge Sutton (joined by seven of his colleagues) persuasively explained, "ambiguity for *Chevron* purposes comes at the end of the interpretation process, not at the beginning. The clear-statement canons eliminate any power-enhancing uncertainty in the meaning of the statute." *In re MCP No. 165*, 20 F.4th at 280 (Sutton, C.J., dissenting). The government similarly insists these canons are "extra-textual," Opp. 27, but that attempted taunt actually describes many key canons of construction, *e.g.*, the presumption against implied repeals.[5]

Any one of the clear-statement canons discussed above would require clear statutory authorization for the Mandates. But as demonstrated next, the invoked statutes—5 U.S.C. §§ 3301, 3302, and 7301—do not provide such power at all, let alone "clearly" (and thus the Mandates would fail even if the clear-statement canons did not apply). The government contends that these three statutes "unmistakabl[y]" provide the Executive with authority to impose the Mandate. Opp. 28. But in a different section of its brief, the government frankly

---

[5] For the same reason, the Court should reject the government's argument—made only in passing and thus waived in any event—that the canons do not apply when "presidential … authority" is involved. Opp. 28. The canons apply whenever Congress "delegates the power to make decisions of vast economic and political significance"—the canons are not limited only to *certain* delegations of vast significance. *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1925 (2020) (Thomas, J., concurring in part). In any event, the government is wrong to imply the actions challenged are solely those of the President himself, given that each agency has openly admitted that it has implemented its own vaccine policies.

acknowledges that "the statutes relied upon are narrow in scope." Opp. 31. Too narrow, it turns out, to support the expansive Mandates.

*5 U.S.C. § 3301.* The government cites 5 U.S.C. § 3301, but that provision undoubtedly applies only to "applicants" seeking "admission … into the civil service." *Id.* It says nothing about *current* federal employees. Even if it did apply to current employees, though, it allows only for the "ascertain[ment]" of "health," not the imposition of a medical procedure. *Id.* Further, the government places too much weight on § 3301's phrase "promote the efficiency of [the civil] service." *Id.* In every case involving the Contractor Mandate, the government relied on a similar statute allegedly authorizing the President to set rules for "an economical and efficient system for" procurement, 40 U.S.C. § 101, and many courts rejected the government's argument that this "efficiency" language authorized something as novel and expansive as a vaccine mandate, *see Georgia v. Biden*, No. 1:21-CV-163, ___ F. Supp. 3d ___, 2021 WL 5779939, at *10 (S.D. Ga. Dec. 7, 2021); *Kentucky v. Biden*, No. 3:21-CV-55, ___ F. Supp. 3d ___, 2021 WL 5587446, at *7 (E.D. Ky. Nov. 30, 2021); *State v. Nelson*, No. 8:21-CV-2524, ___ F. Supp. 3d ___, 2021 WL 6108948, at *11–12 (M.D. Fla. Dec. 22, 2021). The same logic applies to § 3301's use of "efficiency."

*5 U.S.C. § 3302.* In passing, the government also invokes 5 U.S.C. § 3302, which states that the "President may prescribe rules governing the competitive service." *Id.* But that must be read in context. The very next sentence says, "The rules shall provide, as nearly as conditions of good administration warrant, for … (1) necessary exceptions of positions from the competitive service; and (2) necessary exceptions from the provisions

11

of sections 2951, 3304(a), 3321, 7202, and 7203 of this title." *Id.* The "rules" that the President may prescribe under § 3302 are thus rather limited in nature—of the type that exempt certain employees from Congress's statutorily created civil service rules and (pursuant to the cross-references) from certain reports and examinations, as well as authorizing the President to prohibit marital and disability discrimination (notably absent is a cross-reference to any statute about mandating medical procedures, even though inoculations have been around for centuries). But even if § 3302 were not so limited, it fails to provide authority for a vaccine mandate for the same reason as § 3301: the language is far too thin a reed.

**5 U.S.C. § 7301.** The final statutory authority on which the government relies is 5 U.S.C. § 7301, which says in its entirety, "The President may prescribe regulations for the conduct of employees in the executive branch." *Id.* But mandating employees to be vaccinated is not regulating their "conduct" at all. The government retorts that "the act" of forcing someone to get vaccinated is "plainly 'conduct'" that the President may require. Opp. 27. It is hardly "plain." In context, § 7301 must reasonably be construed to mean *workplace* "conduct," or else the government's argument would authorize the President to dictate even private behavior by federal employees—a true "elephant in a mousehole" if there ever were one. *See Kentucky*, ___ F.4th ___, 2022 WL 43178, at *15 (rejecting government's similarly expansive view of its contracting power). But the act of forcibly undergoing vaccination, even if deemed "conduct," is still not workplace conduct. As the Sixth Circuit held vis-à-vis the Contractor Mandate, all historical examples of government

regulation via procurement rules were "modest, 'work-anchored' measure[s] with an inbuilt limiting principle," but a vaccine mandate "requires vaccination everywhere and all the time"—"[i]t is not 'anchored' to the statutory text, nor is it even 'anchored' to the work of federal contractors." *Id.* The same applies for federal employees.

Historically, these provisions have been limited to regulating workplace conduct (ethics, advancement, labor relations, harassment), even when the targeted activity also occurs outside the workplace. *See, e.g.*, 62 Fed. Reg. 43,451 (Aug. 9, 1997) (EO regulating "exposure to tobacco smoke *in the Federal workplace*"); 77 Fed. Reg. 24,339 (Apr. 18, 2012) (Presidential Memorandum to "prevent domestic violence *within the workplace*"). The government's invocation of President Reagan's EO prohibiting drug use is especially unusual given that so many cases rejecting the government's other arguments have arisen in the context of that EO, as discussed above. Opp. 27. In any event, that EO is a poor comparison for the government's asserted power because (1) it focused on a drug-free "workplace," (2) federal law already outlawed the use of illegal drugs, and (3) Congress repeatedly—*for decades*—authorized funding and requirements for this employee drug testing, meaning Congress has given its stamp of approval for such regulations, *something completely absent in the context of medical procedures or vaccines*.[6]

---

[6] *See, e.g.*, Pub.L. 115-271, Title VIII, §§ 8105, 8107, Oct. 24, 2018, 132 Stat. 4105, 4107; Pub.L. 105-261 , Div. A, Title XI, § 1108, Oct. 17, 1998, 112 Stat. 2142; Pub.L. 100-71, Title V, § 503 , July 11, 1987, 101 Stat. 468; Pub.L. 105-277 , Div.A, § 101(h) [Title VI, § 634], Oct. 21, 1998, 112 Stat. 2681 480, 2681-524; Pub.L. 105-61, Title VI, § 621 , Oct. 10, 1997, 111 Stat. 1313; Pub.L. 104-208 , Div. A, Title I, § 101(f) [Title VI, § 623], Sept. 30, 1996, 110 Stat. 3009-314, 3009-358; Pub.L. 104-52, Title VI, § 624 , Nov. 19, 1995, 109 Stat. 502; Pub.L. 103-329, Title VI, § 638 , Sept. 30, 1994, 108 Stat. 2432. More information on these sources is gathered in the "Editor's and Revisor's Notes" on Westlaw, under the "History" tab of 5 U.S.C. § 7301.

If the government is correct that these statutes provide the President with unreviewable power, then they may very well violate the nondelegation doctrine. But the Court need only construe the statutory language in a reasonable manner to avoid such a concern. *Industrial Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality) (applying a narrowing construction to avoid nondelegation concerns).

One final point: as Chief Judge Sutton reminded us, if the government's argument is accepted, it would "come[] with easy-to-overlook risks." *In re MCP No. 165*, 20 F.4th at 273–74 (Sutton, C.J. dissenting). "[A]nother administration" could pursue "a different direction," for example by *banning and firing* every federal employee who has ever been vaccinated, and the government would presumably contend that such a diktat is likewise an unreviewable presidential regulation of "conduct." *Id.* That is untenable.

### D.    Plaintiffs Are Likely To Prevail On Their APA Claims.

#### 1.    There Is Final Agency Action.

The government first argues there is no final agency action, Opp. 20–21, but this is just a rehash of its flawed CSRA theory, which is likewise premised on the erroneous view that Plaintiffs are challenging individual employment actions, even though the Complaint expressly says otherwise (repeatedly). Compl. ¶¶ 13, 160. Plaintiffs challenge the Defendant Agencies' policies of requiring vaccinations, which are certainly final decisions (unless the government is implying it plans to eliminate the vaccine requirements). Once again, the government's view has been rejected by the D.C. Circuit, which held, in asserting jurisdiction over an APA challenge to an agency's implementation of President Reagan's

drug-testing EO, that such a "program is clearly an 'agency action' within the meaning of the APA's judicial review provisions." *Weinberger*, 818 F.2d at 942 n.11.

To the extent the government argues that the agencies do not actually have a policy of requiring vaccines, it blinks reality. Almost every single one of the *government's own declarants* openly acknowledges that each agency is "requiring its civilian employees to be vaccinated against COVID-19." Gov't Exs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19. That is clearly a policy for purposes of the APA. *See* PI 17.

### 2.     The Mandates Are Arbitrary And Capricious.

Plaintiffs demonstrated that the Mandates are arbitrary and capricious because they fail the reasoned-decisionmaking requirement of the APA by providing only conclusory statements that mandating vaccinations will ensure the safety of the federal workforce. There are numerous critically important aspects that are never mentioned or justified, like why vaccines are mandated for federal employees and contractors when OSHA simultaneously said that masking-and-testing provides roughly equivalent protection, or why a vaccine mandate was unnecessary for healthcare workers. *See Hampton v. Wong*, 426 U.S. 88, 115–16 (1976) (reviewing and rejecting regulation issued pursuant to § 3301, where regulation relied on "the administrative desirability of having one simple rule" but did not make "any considered evaluation" of the harms and benefits).

The government insists that it need not suffer the indignity of having to explain itself. Opp. 22. The government has raised similar arguments in other mandate cases—and repeatedly lost because an agency cannot simply claim something to be true and require

courts to accept it. *See, e.g.*, *Texas v. Becerra*, No. 2:21-CV-229, ___ F. Supp. 3d ___, 2021 WL 5964687, at *13 (N.D. Tex. Dec. 16, 2021) (invalidating similar vaccine mandate because, *inter alia*, "Defendants allowed regular testing as an alternative to vaccination in the OSHA mandate but provide no explanation why that exception cannot apply here," and the mandate made an unjustifiable "sweeping application … sans exceptions"); *Missouri v. Biden*, ___ F. Supp. 3d ___, 2021 WL 5564501, at *7–*11 (E.D. Mo. Nov. 29, 2021) (invalidating similar federal vaccine mandate for failure to address significant questions).

The government next argues that the Court should defer to the agencies' "systematic approach" (read: an unreasoned, "one-size-fits-all sledgehammer," *BST*, 17 F.4th at 612) because mandating vaccines involves an area of "complex scientific data within [the agencies'] technical expertise." Opp. 23. Left unsaid is exactly how agencies like (for example) the Departments of Energy and Commerce have expertise in the realm of vaccine mandates. To the extent the government is claiming that the President's *COVID Task Force* is the one to which deference is owed because it is actually setting policy, *see id.*, the Court should deem the Task Force's actions reviewable—and enjoin the Task Force itself. *See Texas v. EEOC*, 933 F.3d 433, 441–42 (5th Cir. 2019). The government is left to debate the merits of mandatory vaccines, but Plaintiffs' primary argument is that even if the government could impose mandates consistent with the APA, Defendants never actually bothered to explain their actions, and that is *per se* arbitrary and capricious. *See* PI 18–21.

The government also disputes that the various vaccine Mandates are "contrived," labeling such claims "rhetoric." Opp. 24. The Fifth Circuit disagrees. *BST*, 17 F.4th at 612

("[T]he Administration pored over the U.S. Code in search of authority, or a 'work-around,' for imposing a national vaccine mandate.").

## II.   Plaintiffs Will Suffer Imminent, Irreparable Harm Absent Relief.

There is unrebutted evidence that rapidly cascading discipline is *imminent* for employees who have not sought exemptions. Exs. 15, 16, 17, 18, 20, 26, 27, 28, 29, 37, 38. The government has apparently conveyed the same understanding to the media. Alex Gangitano & Morgan Chalfant, *Federal Agencies Prepare to Act Against Unvaccinated Employees*, THE HILL, https://thehill.com/homenews/administration/588836-federal-agencies-prepare-to-act-against-unvaccinated-employees (Jan. 9, 2022).

This Court has already indicated that this imminent harm is also likely *irreparable*. In *Rodden*, the Court noted that a plaintiff who had "not claimed an exemption" and for whom "the process to discipline her has already begun" "appears" to have "shown a likely irreparable injury." *Rodden*, 2021 WL 5545234, at *2. Any doubt about irreparability was laid to rest by Plaintiffs' expert report, *see* PI Ex. 12, to which the government submits no rebuttal report. The expert explained why, unlike a typical employment scenario, discipline pursuant to the Mandates irreparably harms Plaintiffs' reputations. *See id.*

In response, the government tellingly focuses on "financial consequences"—while almost completely ignoring the asserted reputational harms that comprise nearly the entirety of Plaintiffs' argument. Opp. 16–17. The government insists that employment actions are generally not irreparable, *id.*, but this sidesteps the unusual nature of public servants being labeled by the President of the United States as selfish killers of innocents—

17

targeting that is ongoing now, even before any employee is actually terminated. The government never directly responds to the reputational-harms argument, let alone demonstrates that Plaintiffs' tarnished reputations as "killers" could somehow be compensable by money (especially given Plaintiffs' unrebutted expert report).

The Fifth Circuit has long recognized that this reputational harm meets the heightened test for irreparable harm in the employment context. *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017); *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997).[7] The government claims *Burgess* and *Valley* are distinguishable because those plaintiffs brought claims challenging "infirm hearings," Opp. 17 n.8, but neither opinion relied on that basis when agreeing there was irreparable harm. Both are premised on agency action that causes "reputational harm … in addition to 'the concomitant destruction of his career in his chosen profession.'" *Burgess*, 871 F.2d at 304 (citing *Valley*). The same here.[8]

## III.    The Public Interests And Equities Weigh In Favor Of Plaintiffs.

The government says the Mandates are needed to "slow[] the spread of COVID-19 among millions of federal employees and the members of the public with whom they interact." Opp. 37. But based on data the government provided to the media, most agencies have 98-plus-percent compliance, meaning that out of 3.5 million employees, only "a few thousand employees have not gotten the vaccine or presented a valid medical or religious

---

[7] *See also Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020) (finding irreparable harm for federal employees in part because of "the stigma" of being "discharged under these circumstances").

[8] The government disputes that clearances may be revoked for failure to follow vaccine requirements, Opp. 18, but it begs belief that the government would not revoke clearances for "violation of a lawful order."

exemption from the policy." Gangitano & Chalfant, *Federal Agencies Prepare*, *supra*. The government never explains why it has such strong equities in crushing those remaining employees who have refused to give in, especially with such high overall vaccine rates among the remaining employees. *See Roe*, 947 F.3d at 233 (government has diminished equities where "the preliminary injunction applies to a limited number" of employees).

In any event, there is no equitable interest in illegal action, regardless of the desire to thwart COVID. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021). The government's equities are also diminished given its delay in imposing the Mandates. *See Kentucky*, ___ F.4th ___, 2022 WL 43178, at *17; *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (equitable interests "tilt[] against" a party who waits "years" to initiate action).

The government further claims there is efficiency in forcing every claim through the CSRA, Opp. 37, but Plaintiffs state yet again that they are not challenging individual employment actions. *Cf.* Oral Argument Transcript 106, *OSHA* (Justice Alito: "I tried to make it as clear as I could. I'm not making that point. I'm not making that point. I'm not making that point."). In any event, the government's argument is illogical. The government should prefer a single ruling, rather than having to defend thousands of individual cases.

## IV. Relief Should Be Universal.

Plaintiffs demonstrated in their opening brief that this is the rare case where a "universal" injunction is proper, given that Feds for Medical Freedom has over 6,000 members spread across every state and in many foreign countries, and in nearly every federal agency. PI Ex. 14. Judge Baker enjoined the contractor mandate nationwide on the

same rationale. *See Georgia*, 2021 WL 5779939, at *12.

The concerns the Fifth Circuit voiced in *Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021), are not present here. The most salient other case challenging EO14043 is *Rodden* and thus does not present concerns of "inconsistent[] ruling[s]." *Id. Becerra* even endorsed broad injunctions where the "circumstances" of the case call for it, such as when there is "a concern that 'a geographically-limited injunction would be ineffective,'" *id.*, which is precisely the scenario here—something the government barely disputes (if at all).

Nor does the government dispute that members of Feds for Medical Freedom would be entitled to relief due to their membership, even if not named as individual Plaintiffs. As new members join, they would likewise be entitled to the same relief, as would any current member who is subsequently subjected to harm because of the Mandates. That is why, contrary to the government's suggestion, an injunction would need to bar all Defendants (except the President himself) and all of Defendants' officers, agents, and successors, *see* Fed. R. Civ. P. 65, from implementing or enforcing the Employee Mandate against anyone.[9]

---

[9] Plaintiffs briefly respond to a portion of the government's APA preclusion arguments on the Contractor Mandate, in the event the government tries later to apply those theories to the Employee Mandate, too. The government contends that the challenged agency actions are just the actions of the President himself and thus unreviewable under the APA. Opp. 34–35. But that is inconsistent with the D.C. Circuit's opinion in *Reich*, which authorizes both APA and *ultra vires* claims against agencies in this scenario. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 177–78 (D.D.C. 2020). Moreover, there has been far more than "ministerial" implementation of EO14043. Defendant Agencies greatly expanded on EO14043's bare bones requirement to get vaccinated. Compl. ¶ 124. Most notably, EO14043 told agencies to "implement" their own "programs," Ex. 1, § 2, and Defendant Agencies have independently chosen to follow the Task Force requirements—something EO14043 did not require, as this Court held: "[N]owhere does [EO14043] give the Task Force the authority to bind agencies to its issued guidance.'" *Rodden*, 2021 WL 5545234, at *3.

Dated: January 11, 2022

Respectfully submitted,
/s/ R. Trent McCotter
R. TRENT MCCOTTER (So. Dist. No. 3712529)
JONATHAN BERRY (pro hac vice pending)
MICHAEL BUSCHBACHER (pro hac vice pending)
JARED M. KELSON (pro hac vice pending)
BOYDEN GRAY & ASSOCIATES
801 17th St. NW, #350
Washington, DC 20006
(202) 706-5488
mccotter@boydengrayassociates.com

**CERTIFICATE OF WORD AND PAGE COUNTS**

I hereby certify that the total number of words in this document, exclusive of those sections designated for omission, is 5883 words, as registered by Microsoft Word. I further certify that this document, exclusive of those sections designated for omission for word limit purposes, is 20 pages. I further certify that this document is in size 13 Times New Roman font.

/s/ R. Trent McCotter

R. Trent McCotter

**CERTIFICATE OF SERVICE**

I certify that on January 11, 2022, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ R. Trent McCotter

R. Trent McCotter