IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| FEDS FOR MEDICAL FREEDOM, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>JOSEPH R. BIDEN, JR., in his official<br>capacity, *et al.*,<br><br>    Defendants. | Civil Action 3:21-cv-00356 |

## DEFENDANTS' MOTION FOR STAY PENDING APPEAL

Defendants respectfully seek a stay pending appeal of the Court's order of January 21, 2022, which entered a nationwide injunction prohibiting the Executive Branch from implementing or enforcing Executive Order No. 14043, 86 Fed. Reg. 50,989 (Sept. 14, 2021). *See* ECF No. 36 ("Order").  In the alternative, Defendants request that the injunction be partially stayed so that it provides only the relief necessary to redress Plaintiffs' alleged irreparable injuries.

As explained below, a stay is appropriate because the government is highly likely to succeed on its appeal.  Federal employees may raise work-related disputes, if at all, only through the mechanisms Congress has provided in the Civil Service Reform Act ("CSRA"), including judicial review in the Federal Circuit; they may not raise such disputes directly in district court.  The Supreme Court has made clear that this principle applies even when a federal employee purports to bring programmatic challenges to generally applicable policies,

1

and even though a federal employee might be unable to seek Article III review until he has been subject to discipline. *See generally Elgin v. Dep't of Treasury*, 567 U.S. 1, 7–8 (2012). With respect, this Court erred in holding otherwise. In any event, as every other court to consider the question has correctly held, the President has ample authority to require that federal employees be vaccinated—just as private employers may require their employees to be vaccinated. *See Rydie v. Biden*, No. 21-2696, 2021 WL 5416545, at *3 (D. Md. Nov. 19, 2021), *appeal filed*, No. 21-2359 (4th Cir. Dec. 7, 2021); *Oklahoma v. Biden*, --- F. Supp. 3d ---, 2021 WL 6126230, at *10 (W.D. Okla. Dec. 28, 2021); *Brnovich v. Biden*, No. 21-cv-1568, ECF No. 156 at 24 (D. Ariz. Jan. 27, 2022); *Brass v. Biden*, No. 21-2778, 2021 WL 6498143, at *3 (D. Colo. Dec. 23, 2021) (report and recommendation), *adopted*, 2022 WL 136903 (D. Colo. Jan. 14, 2022); *see also Smith v. Biden*, No. 21-19457, 2021 WL 5195688, at *6 (D.N.J. Nov. 8, 2021), *appeal filed*, No. 21-3091 (3d Cir Nov. 10, 2021).

Equitable factors also heavily favor staying the injunction in its entirety. The injunction usurps the President's authority to oversee the federal workforce and unnecessarily impairs the Executive Branch's operations, including by shutting down the mechanism for considering employees' requests for religious and medical exceptions to the vaccination requirement. It also irreparably harms the government's interests—shared by the public—in stemming the spread of COVID-19, promoting efficient government operations, and handling federal employees' workplace grievances through the comprehensive and exclusive processes prescribed by Congress. These harms outweigh any of the quintessentially reparable harms that might befall Plaintiffs if the injunction were stayed and they faced the prospect of workplace discipline.

At a minimum, the Court should stay the injunction's nationwide applicability and narrow its scope. Affording relief to individuals who are not properly before the Court violates the well-established principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).

Defendants respectfully request a ruling by the end of the day on Thursday, February 3, 2022. After that date, if relief has not been granted, Defendants will seek relief from the U.S. Court of Appeals for the Fifth Circuit.

## ARGUMENT

Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A district court that has found a likelihood of success on the merits for plaintiffs in granting a preliminary injunction is not required to reverse its position to grant a stay of that injunction. The Fifth Circuit has explained that, while "[l]ikelihood of success [is] a prerequisite in the usual case[, . . . ] it is not an invariable requirement." *Ruiz v. Estelle*, 666 F.2d 854, 857 (5th Cir. 1982). Rather, "the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 438–39 (5th

Cir. 2001) (internal quotations and citations omitted).  Here, the significance of Defendants'

arguments on appeal, together with the relevant equitable considerations, weighs heavily in

favor of granting a stay pending appellate review.

**I.      Defendants Are Likely To Succeed On The Merits Of Their Appeal.**

In entering a nationwide injunction, the Court rejected two substantial arguments

advanced by Defendants: that the CSRA divests the Court of jurisdiction, and that the

Executive Order falls within the President's constitutional and statutory authority to oversee

the federal workforce.  Defendants' likelihood of success on either issue would independently

support a stay; taken together, the case for a stay is overwhelming.[1]

**A.  Plaintiffs' Claims Are Precluded By The Civil Service Reform Act.**

As Defendants have explained, the CSRA's remedies are "the *comprehensive and exclusive*

procedures for settling work-related controversies between federal civil-service employees and

the federal government."  *Rollins v. Marsh*, 937 F.2d 134, 139 (5th Cir. 1991) (emphasis added).

And binding Supreme Court precedent makes clear that even programmatic challenges to

broadly applicable policies fall within the CSRA's preclusive scope.  *See Elgin*, 567 U.S. at 7–8

(CSRA precluded district court action by federal employees seeking not only "reinstatement

---

[1] The Court also erred in determining that Plaintiffs have ripe claims for the reasons stated in Defendants' preliminary injunction opposition brief.  *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 12–14, ECF No. 21 ("PI Opp'n").  This is especially true with respect to those Plaintiffs with pending exception requests, whose claims the Court acknowledged "are indeed at least arguably unripe," but as to whom the Court nonetheless ordered relief.  Order at 7. Further, this Court never considered the extent to which Feds for Medical Freedom has associational standing—or how many of its so-called "members" it legitimately represents for purposes of this litigation—before concluding that all FMF "members" are entitled to injunctive relief.

to their former positions, backpay, benefits, and attorneys' fees," but also "a declaratory judgment that the challenged statutes are unconstitutional").

In the present action, the Court found that "[t]o deny the plaintiffs the ability to challenge the mandate pre-enforcement, in district court, is to deny them meaningful review," Order at 7, but that conclusion is flatly inconsistent with *Elgin*. As the Supreme Court stated there, "the CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit," which is "fully capable of providing meaningful review." *Elgin*, 567 U.S. at 10. In *Elgin*, as here, the federal-employee plaintiffs objected to a condition of federal employment and, rather than submitting to that condition, sought "equitable relief in the form of a declaratory judgment that the [challenged provision of federal law was] unconstitutional" and "an injunction prohibiting" its enforcement. *Id.* at 7–8. Writing for the Court, Justice Thomas rejected that contention, noting that such challenges "would reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Id.* at 14; *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208–09 (1994) (statute setting forth a "comprehensive review process" and vesting "the court of appeals [with] exclusive jurisdiction over challenges to agency enforcement proceedings" precluded pre-enforcement challenge to the authorizing statute in district court).

This Court also determined that the requirement that federal employees be vaccinated against COVID-19 did not constitute a "significant change in duties, responsibilities, or working conditions" to which the CSRA applies. Order at 5 (quoting 5 U.S.C. § 2302(a)(2)(A)(xii)). But the lone case the Court cites for that proposition, *Turner v. U.S.*

*Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020), is inapposite. The Court in *Turner* held that all of the plaintiff's statutory claims were precluded by the CSRA, *see id.* at 364–66, and allowed a constitutional claim to proceed in circumstances dramatically different than in the instant case, *see id.* at 367–69 (federal employee alleged that her employers transformed her workplace "into organs of state media that actively suppress the First Amendment rights of their employees"). By contrast, Plaintiffs here sought and obtained relief on only statutory claims. And they merely object to a standard term of their federal employment (not a "transformation" to "the background assumptions behind" doing their job, *Turner*, 502 F. Supp. 3d at 367), just like the federal employees who objected to registering for the Selective Service in *Elgin*, *see* 567 U.S. at 7.

At bottom, Plaintiffs present a "work-related controvers[y] between federal civil-service employees and the federal government," and the CSRA provides "the comprehensive and exclusive procedures for settling" such controversies. *Rollins*, 937 F.2d at 139. As such, *Elgin* and the rest of the "above-referenced authorities command that this dispute be governed by the CSRA's comprehensive and exclusive remedial scheme provided by Congress." *Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *3 (N.D. Tex. July 31, 2013) (holding that the CSRA barred claims by Immigration and Customs Enforcement agents who asserted a programmatic challenge to the Deferred Action for Childhood Arrivals program after their "non-compliance with the program led to the threat of workplace disciplinary action against them").

**B. Executive Order 14043 Falls Squarely Within The President's Constitutional And Statutory Authority.**

Defendants are also likely to succeed on appeal because, as other courts have uniformly held, Executive Order 14043 falls within the President's constitutional and statutory authority. *See Rydie*, 2021 WL 5416545, at *3 ("The President derives his authority to regulate the federal workforce from the Constitution, not from Congress's enactments."); *Oklahoma*, 2021 WL 6126230, at *10 (EO 14043 "is a permissible exercise of executive authority . . . substantially for the reasons stated in *Rydie*"); *Brnovich*, No. 21-cv-1568, ECF No. 156 at 24 (EO 14043 "is an exercise of the President's considerable constitutional authority to regulate the internal affairs of the executive branch" (citing *Rydie*, 2021 WL 5416545, at *3)); *Brass*, 2021 WL 6498143, at *3 (similar); *see also Smith*, 2021 WL 5195688, at *6.

**i. The President Has Inherent Constitutional Authority To Oversee The Federal Workforce.**

Any analysis of the President's authority to set the conditions of employment in the federal workforce must recognize that, absent congressional action purporting to limit that authority, the President has inherent constitutional authority under Article II to act as chief executive officer of the Executive Branch. That responsibility includes the authority to establish and maintain terms and conditions of employment for the Executive Branch. *See, e.g.*, *Rydie*, 2021 WL 5416545, at *3. The President thus possesses broad discretion in determining how best to manage the Executive Branch: whom to hire and remove, what conditions to place on continued employment, and what processes to employ in making these decisions. *See, e.g.*, Circular, Dep't. of State (Mar. 20, 1841), *reprinted in* U.S. Civil Serv. Comm'n, History of the Federal Civil Service (U.S. Gov't Printing Office 1941) (Secretary of State

Daniel Webster relaying President Harrison's instruction that "partisan interference in popular elections, whether of State officers or officers of this Government, and for whomsoever or against whomsoever it may be exercised, or the payment of any contribution of assessment on salaries, or official compensation for party or election purposes, will be regarded by him as cause of removal").

Contrary to the Court's suggestion, *see* Order at 15–16, the President's constitutional authority presumptively extends to the management of all Executive Branch personnel, not just officers of the United States—which is why Congress sometimes limits the President's authority with respect to employees. *See, e.g.*, 42 U.S.C. § 2000e-16 (Title VII protections for civil servants); 5 U.S.C. §§ 7503(a), 7513(a) (discipline of civil servants "only for such cause as will promote the efficiency of the service"); *see also U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557-58 (1973) (noting that, prior to the Civil War, "the spoils system under which federal employees came and went, depending upon party service and changing administrations, rather than meritorious performance," was the "prevalent basis for governmental employment"). The appropriate question is whether Congress has purported to *prohibit* the Executive Branch from requiring its employees to be vaccinated, and there is no dispute that it has not.

It is thus incorrect to suggest that the government has offered "no limiting principle to the reach of" the President's power. *See* Order at 16. Most relevant here, the CSRA authorizes removal, suspension, and other enumerated discipline only "for such cause as will promote the efficiency of the service." 5 U.S.C. §§ 7503(a), 7513(a). Any covered plaintiff who might be disciplined for failing to become vaccinated under Executive Order 14043 could seek

8

review of such discipline under the CSRA and contend that the discipline did not satisfy the statutory standard.  Because the Merit Systems Protection Board ("MSPB") and the Federal Circuit have been designated by Congress to apply this statutory scheme, there is no need or basis for courts to impose additional limitations on the President's authority to manage the Executive Branch workforce.

### ii. Congress Has Confirmed The President's Authority To Oversee The Federal Workforce.

Even if explicit statutory authority were necessary, Congress has provided the President expansive authority to regulate the federal workforce.  *See Rydie*, 2021 WL 5416545, at *3; *Oklahoma*, 2021 WL 6126230, at *10; *see also Smith*, 2021 WL 5195688, at *6–7 (employee vaccination requirement is within the federal government's "broad[]" authority when acting as "an employer under 5 U.S.C §§ 3301, 3302, 7301").  Most importantly, 5 U.S.C. § 7301 permits the President to "prescribe regulations for the conduct of employees in the executive branch." The Court reads the word "conduct" to mean "workplace conduct," Order at 13, but that is not what the statute says.  Had Congress meant to limit this grant of authority to the "workplace"—as it did with its reference to "occupational" safety in the Occupational Safety and Health Act, *see Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 665 (2022) (per curiam)— "it knew how to say so."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018).  There was no basis for the Court to add an atextual limitation to the statute's broad grant of authority. And in any case, the Executive Order does regulate workplace activity, because it ensures that federal workers are vaccinated (or otherwise subject to a reasonable accommodation) when they enter the worksite and interact with their colleagues or the public.

9

Nor should the Court have rejected the government's reliance on 5 U.S.C. §§ 3301 and 3302. Courts have recognized that, "[u]nder 5 U.S.C. § 3301, Congress has delegated broad authority to the President to establish the qualifications and conditions of employment for civil servants within the executive branch." *Am. Fed'n of Gov't Emp. v. Hoffman*, 543 F.2d 930, 938 (D.C. Cir. 1976); *see also Atkins v. Salazar*, 677 F.3d 667, 670-71 & n.1 (5th Cir. 2011) (noting, in upholding the application of National Park Service medical qualification standards to a long-time employee, that the standards had been promulgated under 5 U.S.C. § 3301). The authority to establish requirements for new federal employees necessarily includes the authority to modify requirements for existing employees. Similarly, under 5 U.S.C. § 3302, the President may "prescribe rules governing the competitive service"—and the statute's identification of certain topics that the rules "shall" address should not be read as providing the outer limit of the President's authority.

In any event, there is nothing unusual about the President addressing employees' conduct both on- and off-duty. *See, e.g.*, Exec. Order No. 12564, 51 Fed. Reg. 32,889, 32890 (1986) (President Reagan prohibiting "[t]he use of illegal drugs by Federal employees, whether on duty or off duty"); Exec. Order 12674, 54 Fed. Reg. 15,159, 15,159 (1989) (President George H.W. Bush requiring employees to "satisfy in good faith their obligations as citizens, including all just financial obligations, especially those—such as Federal, State, or local taxes— that are imposed by law"); Exec. Order 11491, 34 Fed. Reg. 17,605 (1969) (President Nixon providing that Executive Branch employees have the right "to form, join, and assist a labor organization," but requiring that the labor organization's "internal business . . . shall be conducted during the non-duty hours"). As the Supreme Court has recognized, such executive

10

orders are "plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch," *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 274 n.5 (1974) (upholding Executive Order 11491)—particularly in "view of the substantial federal interests in effective management of the business of the National Government and exclusive control over the conduct of federal employees," *id.*; *see also Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (per curiam) (looking to "longstanding practice of [the Executive Branch] in implementing the relevant statutory authorities" in upholding a federal vaccination requirement).

## II.   The Balance Of Equities Overwhelmingly Favors A Stay.

The remaining stay factors tilt decisively in favor of the government.  *First*, the Court's broad injunction irreparably harms the government's—and the public's—interest in stemming the spread of a deadly, highly contagious disease within the federal workforce and among the millions of Americans it serves.  *See* Order at 18 ("The government has an undeniable interest in protecting the public against COVID-19."); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (similar).   "While most Federal civilian employees are fully vaccinated, hundreds of thousands of them are not vaccinated"—and "tens of thousands" of these unvaccinated employees "do not have a pending or approved request for an exception."  Ex. A, Decl. of Jason Miller, Deputy Director for Management, Office of Management and Budget ¶ 5 ("Miller Decl.").   "[O]ver 20,000 federal civilian employees are hired in a typical month." *Id.* ¶ 6.  As long as the injunction is in place, these individuals are not subject to any vaccination requirement, which will drive down the overall percentage of fully vaccinated federal employees.  *Id.*

As this Court has observed, "vaccines are undoubtedly the best way to avoid serious illness from COVID-19." Order at 19.[2]  In addition, "[v]accination can reduce the spread of disease"—not only within the federal workforce but also among the members of the public with whom federal employees interact.  *See, e.g.*, Centers for Disease Control & Prevention, COVID-19 Vaccines Work (updated Dec. 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html; *accord* Miller Decl. ¶¶ 4, 8, 10.  Accordingly—as several other courts have recognized, including in cases brought by individuals who are members of Feds for Medical Freedom ("FMF")[3]—"barring enforcement of the vaccine requirement for federal employees would do substantial and irreparable harm to the public health." *Rydie*, 2021 WL 5416545, at *5; *see Church v. Biden*, No. 21-cv-2815, 2021 WL 5179215, at *19 (D.D.C. Nov. 8, 2021) (similar); *Smith*, 2021 WL 5195688, at *9 (similar); *Altschuld v. Raimondo*, No. 21-cv-02779, 2021 WL 6113563, at *5 (D.D.C. Nov. 8, 2021) (similar); *cf.*

---

[2] *See also, e.g.*, Food & Drug Admin., Emergency Use Authorization Mem. for Pfizer-BioNTech COVID-19 Vaccine at 3–4 (Dec. 30, 2021), https://www.fda.gov/media/155234/download (two-dose vaccine regimen "reduce[s] the risk of serious disease, including hospitalization and death, from [COVID-19, including] the Omicron variant"); Amelia G. Johnson, et al., COVID-19 Incidence and Death Rates Among Unvaccinated and Fully Vaccinated Adults with and Without Booster Doses During Periods of Delta and Omicron Variant Emergence — 25 U.S. Jurisdictions, Apr. 4–Dec. 25, 2021, tbl. 1 (Jan. 28, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e2.htm (data indicating that fully vaccinated adults are several times less likely than unvaccinated adults to be hospitalized or die from COVID-19, including Delta and Omicron variants).

[3] For example, Charles L. Carpenter, James Cernock, Kimberly R. Christoff, Jeffrey Dice, Kimberly Elsholz, Troy L. Hess, Audra M. Morris, Mike Orloff, Doug Popovich, Donald E. Snively, Chris Stinchfield, Marcus W. Thornton, Michael Weinfurnter, and Jonathan D. Williams are all named plaintiffs in *Altschuld v. Raimondo*, No. 21-cv-02779 (D.D.C.), and are also described as FMF "members" in the present litigation, Compl. ¶ 77, ECF No. 1.  Further, Jarod Smith is a named plaintiff in both cases.

*Missouri*, 142 S. Ct. at 655 (staying district court injunctions of federal vaccination requirement for healthcare workers).

*Second*, the Court's injunction irreparably harms the federal government by usurping the President's authority over the Executive Branch.  As discussed, the President has broad constitutional and statutory authority to oversee the federal workforce.  *See supra* pp. 7–11. Invalidating Executive Order 14043 is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government."  *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers) (staying district court injunction); *see also Garcia v. United States*, 680 F.2d 29, 32 (5th Cir. 1982) (cautioning against judicial "intrusion" into federal employment disputes).  This injury "is irreparable in the basic sense of the word; there is no way to recover the time when [the President's] exercise of discretion is being enjoined during the pendency of the appeal." *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021), *opinion vacated on reh'g en banc*, --- F.4th ----, 2021 WL 5578015 (5th Cir. Nov. 30, 2021) (Mem.); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting) (an injunction that limits presidential authority is "itself an irreparable injury") (citing *Maryland v. King*, 567 U.S. 1301 (2012)).

*Third*, the injunction irreparably harms "[t]he effective administration of the federal government, in which Defendants and the public have a deep and abiding interest." *Rydie*, 2021 WL 5416545, at *5.  The COVID-19 pandemic has interfered with numerous aspects of the government's work, and the essential services it provides, by, *e.g.*, forcing office closures, limiting official travel, and causing staffing shortages.  *See generally* Pandemic Response Accountability Committee: COVID-19 Emergency Relief and Response Efforts, Top

13

Challenges Facing Federal Agencies (June 2020), https://perma.cc/B7KF-V4RW.  Like many large private employers,[4] the federal government has determined that adopting an employee vaccination requirement will permit it to operate more efficiently.  Numerous federal agencies are currently in a maximum-telework posture and have developed detailed plans to bring employees back into a physical workplace.  Leaving the Court's injunction in place would impede these plans, likely delaying reentry as agencies are forced to revise their plans to account for an increased number of unvaccinated employees.  Miller Decl. ¶¶ 12–16.  It would also impose significant unrecoverable costs on federal agencies (1) by increasing COVID-19-related absences, not only among unvaccinated employees who become ill but also among unvaccinated employees who need to quarantine following exposure to the virus, *id.* ¶¶ 8–10; and (2) by forcing agencies to develop and implement alternative COVID-19 safety protocols, potentially renegotiate labor agreements regarding such protocols, and divert scarce resources away from their core mission-related activities—all to the detriment of taxpayers and the public at large, *id.* ¶¶ 7, 9, 11, 14–16, 20; *accord Church*, 2021 WL 5179215, at *19 (enjoining EO 14043 could "prolong[] remote work, imped[e] public access to government benefits and records, and slow[] governmental programs"); *Rydie*, 2021 WL 5416545, at *5–6 (similar). These disruptive delays, expenditures, and inefficiencies cannot be remedied after the fact. *See, e.g.*, *Texas*, 14 F.4th at 340.

---

[4] *See* White House Vaccination Requirements Report at 12 (Oct. 7, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/10/Vaccination-Requirements-Report.pdf (noting that other large employers including AT&T, Bank of America, CVS, Disney, Google, Hess, Johnson & Johnson, Microsoft, Netflix, Procter & Gamble, Tyson Foods, United Airlines, and Walgreens had adopted employee vaccination requirements).

In addition, the injunction impairs the Executive Branch's systems for accommodating federal employees' religious beliefs and medical conditions.   Federal agencies have spent significant resources soliciting and preparing to process requests for individualized exceptions to the vaccination requirement, as required by federal law.   Miller Decl. ¶ 17.   Tens of thousands of these requests are currently pending, and federal agencies were in the midst of adjudicating them when this Court issued its injunction.   *Id.*   Halting the government's processing of exception requests leaves agency personnel uncertain about what proportion of their workforce may be deemed legally entitled to remain unvaccinated and employees who have submitted exception requests uncertain about their status if the government prevails on appeal—with no apparent benefit to Plaintiffs.   It also imposes unnecessary administrative burdens, as agencies will need to update and re-staff their exception processing systems if the injunction is lifted several months from now.   *Id.*

The injunction also undermines the "comprehensive system for reviewing personnel action taken against federal employees" that Congress established in the CSRA.   *See Elgin*, 567 U.S. at 5 (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)).   The Fifth Circuit has held that preempting CSRA procedures with respect to *a single* employee "would have a far more disruptive effect on" the government "than would, on balance, be the burden on the employee resulting from a refusal to grant the injunction."   *Garcia*, 680 F.2d at 32.   The present injunction's disruptive effect on the government is exponentially greater because the injunction applies to more than 2 million civilian employees, hundreds of thousands of whom are not yet vaccinated.

These irreparable harms to the government and the public clearly outweigh whatever harms Plaintiffs might experience if the injunction were stayed.  This Court cited the Fifth Circuit's *BST Holdings* decision for the proposition that Plaintiffs are irreparably harmed because they face a "Hobson's choice" between getting vaccinated and potentially losing their jobs.  *See* Order at 10 (citing *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021)).  But *BST Holdings* is inapposite because it involved private-sector employees; the Fifth Circuit has repeatedly held that *federal employees* are not irreparably harmed by job loss, observing that they can generally obtain reinstatement if they successfully challenge their discharge through the processes established by the CSRA.  *See White v. Carlucci*, 862 F.2d 1209, 1212–13 (5th Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61 (1974)); *Garcia*, 680 F.2d at 31–32; *Morgan v. Fletcher*, 518 F.2d 236, 239–40 (5th Cir. 1975).  This Court also referenced "the harm sure to come by terminating unvaccinated workers who provide vital services to the nation."  Order at 18.  But there is no evidence in the record to support that assertion.  No named Plaintiff has yet been removed, and removal is not a foregone conclusion in any given case.  *See Connor v. Dep't of Veterans Affairs*, 8 F.4th 1319, 1324 (Fed. Cir. 2021) (listing twelve "nonexclusive" factors—which include the "potential for the employee's rehabilitation" and any "mitigating circumstances surrounding the offense"—that a federal agency "must consider" in determining appropriate workplace discipline under the CSRA (citation omitted)).  And even if removal ultimately occurs, federal employees generally have numerous options for challenging their removal, including review before the MSPB and the Federal Circuit.  Any harm associated with letting these employment-dispute-resolution processes play out in the

manner prescribed by Congress is dwarfed by the irreparable harms to the government and the public interest described above.

### III.    At A Minimum, The Injunction Should Be Stayed To The Extent It Provides Relief That Is Broader Than Necessary To Redress Plaintiffs' Injuries.

If the Court declines to stay the entire injunction, it should at least narrow it.  First, the injunction's nationwide scope transgresses Article III and equitable principles by affording relief to non-parties and to parties over whom the Court lacks jurisdiction—and effectively overrules the numerous other federal courts that have rejected similar challenges to EO 14043. Second, the injunction's prohibition on "implementing or enforcing Executive Order 14043," Order at 20, is far broader than necessary to address Plaintiffs' alleged injury.  A narrower prohibition on disciplining actual Plaintiffs in this case for being unvaccinated would fully redress Plaintiffs' alleged irreparable injury without unnecessarily burdening the government.

### A.  The Injunction Should Be Limited To The Plaintiffs Before This Court.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'"  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Gill*, 138 S. Ct. at 1929–30 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  Accordingly, the Supreme Court has narrowed injunctions that extended relief beyond the harms to "any plaintiff in th[e] lawsuit."  *Lewis*, 518 U.S. at 358.

Principles of equity reinforce those limitations.  A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789.  *Grupo*

*Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999).   And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Nationwide injunctions also "take a toll on the federal court system." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).   "The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . . encourages multiple judges and multiple circuits to weigh in" on a given legal question.   *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring).   In contrast, nationwide injunctions "prevent[] legal questions from percolating through the federal courts." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring).   Moreover, "[i]f a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring).   "A single loss and the policy goes on ice—possibly for good, or just as possibly for some indeterminate period of time until another court jumps in to grant a stay." *Id.*   The present case is illustrative: the government has successfully opposed motions to enjoin EO 14043 in twelve other district courts—including several that specifically recognized that EO 14043 is well within the President's authority—but this Court effectively nullified those courts' decisions by granting nationwide

18

relief.[5]  As the Fifth Circuit recently held in a similar context, "principles of judicial restraint" counsel against allowing "one district court [to] make a binding judgment for the entire country" under the circumstances presented here.  *See Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021).

The Court expressed concern that limiting the relief to Plaintiffs might not be "practical" because FMF claims to have a sizable, geographically dispersed membership.  *See* Order at 19–20.  But the constitutionally grounded principle that non-parties are "not the proper object of th[e court's] remediation" is not subject to an exception for impracticality. *Lewis*, 518 U.S. at 358; *see also, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  To be sure, FMF's representation that it "has more than 6,000 members spread across every state . . . and is actively adding new members" raises practical concerns; it would be challenging for the government to comply with an injunction benefitting a constantly evolving set of FMF members.  *See* Order at 20.  But it is far from clear that FMF has associational standing to litigate on behalf of so-called "members" who have merely submitted a name and email address through its website.[6]  *See, e.g.*, *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d

---

[5] *See Brnovich*, No. 21-cv-1568, ECF No. 156, at 24; *Oklahoma*, ---F. Supp. 3d----, 2021 WL 6126230 at *10; *Brass*, 2021 WL 6498143, at *3; *Rydie*, 2021 WL 5416545, at *3; *Smith*, 2021 WL 5195688 at *6–*7; *see also AFGE Loc. 501 v. Biden*, No. 1:21-cv-23828-JAL, ECF No. 33 (S.D. Fla. Dec. 22, 2021); *Donovan v. Vance*, ---F. Supp. 3d----, 2021 WL 5979250 (E.D. Wash. Dec. 17, 2021); *McCray v. Biden*, No. 21-cv-2882, 2021 WL 5823801 (D.D.C. Dec. 7, 2021); *Navy Seal 1 v. Biden*, ---F. Supp. 3d----, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021); Minute Entry, *Altschuld*, 2021 WL 6113563; *Church*, 2021 WL 5179215; *Foley v. Biden*, No. 4:21-cv-01098-O, ECF No. 18 (N.D. Tex. Oct. 6, 2021).

[6]  *See* Feds for Medical Freedom, "Become a Member," https://feds4medfreedom.org/joinus (last visited Jan. 28, 2022).

330, 344 n.9 (5th Cir. 2012) (associational standing requires "indicia of membership," *i.e.*, a showing that the association's "members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs"); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (similar).  Further, the doctrine of claim-splitting bars some FMF members—notably including its President, Marcus W. Thornton[7]—from obtaining relief from this Court because they have already sued to enjoin EO 14043 in other federal courts.  *See, e.g.*, *Hudson v. AFGE*, 308 F. Supp. 3d 388, 394 (D.D.C. 2018) (claim-splitting doctrine precludes a plaintiff from bringing two suits "involving the same subject matter at the same time in the same court and against the same defendant" (citation omitted)).

In any event, the Court's concern about practicality would more appropriately be addressed by granting relief only to the readily discernible group of federal employees (if any) who possessed the necessary indicia of membership in FMF at the time that FMF filed its complaint.  *Cf., e.g., Am. Pipe. & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974) (rule against one-way intervention prevents potential parties from "await[ing] developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests").  Compliance with such an injunction would be feasible because agencies have already created systems for keeping track of individualized exceptions to the vaccination requirement and could grant temporary litigation-related exceptions to any appropriate

---

[7] *See* Feds for Medical Freedom, "About Us," https://feds4medfreedom.org/about-us (last visited Jan. 28, 2022).  Mr. Thornton is a named plaintiff in *Altschuld*, No. 21-cv-2779 (D.D.C.), where he unsuccessfully attempted to preliminarily enjoin EO 14043 prior to initiating this litigation.

Plaintiffs.  In any event, practical considerations cannot justify granting preliminary relief to individuals who are not parties to this case (including over 2 million federal employees) and parties over whom the Court lacks Article III jurisdiction (including the numerous Plaintiffs and FMF "members" who have pending exception requests and, thus, unripe claims[8]), which exceeds the relief "traditionally accorded by courts of equity," *Grupo Mexicano*, 527 U.S. at 319.

## B. The Injunction Should Be Narrowed To Prevent Only Workplace Discipline Based On Vaccination Status.

It is also well established that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano*, 442 U.S. at 702).  Even if the Court declines to permit enforcement of EO 14043 through discipline during the pendency of this litigation, it should permit the government to otherwise *implement* EO 14043 in ways that cause no harm to Plaintiffs, including by resuming its processing of exception requests, to mitigate the harm to the government if Defendants ultimately prevail in this litigation.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants respectfully request that this Court stay its preliminary injunction pending appeal.


Dated:  January 28, 2022                      Respectfully submitted,

                                             BRIT FEATHERSTON
                                             United States Attorney

---

[8] The Court's opinion does not address whether Plaintiff American Federation of Government Employees, Local 918 has standing.  It does not, for the reasons explained in Defendants' preliminary injunction opposition brief.  *See* PI Opp'n at 14–15.

Eastern District of Texas

 /s/ *James G. Gillingham*
JAMES G. GILLINGHAM
Assistant United States Attorney
Eastern District of Texas
Acting Under Authority Conferred by 28 U.S.C. §
515
Attorney in Charge
Texas Bar #24065295
110 N. College Street; Suite 700
Tyler, Texas 75702
Telephone: (903) 510-9346
Facsimile: (903) 590-1436
James.Gillingham@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF CONFERENCE

I certify that on January 28, 2022, I spoke with Plaintiffs' counsel Trent McCotter and indicated the Defendants would be moving to stay the Court's January 21, 2022 order, which entered a nationwide injunction prohibiting the Executive Branch from implementing or enforcing Executive Order 14043 (ECF No. 36).   Mr. McCotter confirmed that Plaintiffs oppose the Defendants' motion for stay of the preliminary injunction pending appeal.

/s/ *James G. Gillingham*
JAMES G. GILLINGHAM