IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| FEDS FOR MEDICAL FREEDOM, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity, *et al.*, <br><br> Defendants. | Civil Action 3:21-cv-00356 |

### DECLARATION OF JASON MILLER

I, Jason Miller, make the following declaration based on personal knowledge and information made available to me in the course of my official duties:

1. I am the Deputy Director for Management at the Office of Management and Budget (OMB). In this role, I coordinate Government-wide management initiatives to protect, strengthen, and empower the Federal workforce. I am also the Chair of the President's Management Council, and I chair a variety of other Government-wide executive management councils. Previously, I was the Chief Executive Officer of the Greater Washington Partnership, a civic alliance of employers in the National Capital Region focused on issues of regional inclusive economic growth and prosperity. I previously served in the White House as Deputy Assistant to the President and Deputy Director of the National Economic Council—leading economic policy development and coordination related to manufacturing and innovation, transportation and infrastructure, energy, entrepreneurship, and Puerto Rico. Prior to that, I was a management consultant with the Boston Consulting Group in San Francisco and with Marakon Associates in Chicago, where I advised large organizations across industries on strategic, financial and organizational issues. I received a B.A. from the University of Pennsylvania, an M.B.A. from

1

the Kellogg School of Management at Northwestern University, and an M.P.A. from Harvard's Kennedy School of Government.

2.  In my role as Deputy Director for Management at OMB, I regularly interact with agency leaders from across the Federal Government, helping them work through a range of operational issues. Through the President's Management Council and the other Government-wide executive management councils that I chair, agencies regularly report to OMB through my staff and me regarding issues related to COVID-19 workplace safety. This includes issues associated with implementation and enforcement of Executive Order 14043. In addition, I have been in contact with executives from major employers and leading management experts about how large employers are approaching the health and safety of their workforce, including COVID-19 vaccination requirements.

3.  Based on my first-hand knowledge relating to EO 14043 and the procedures and processes to implement it, as well as information provided to me in the course of my duties, complying with the January 21, 2022 preliminary nationwide injunction enjoining implementation and enforcement of Executive Order 14043 ("the injunction") during the pendency of the appellate process will cause significant harm to the Federal Government for at least three reasons. First, if the injunction remains in place, it will imperil the Federal Government's ability to protect the health and safety of the Federal workforce. Second, the significant additional resources required to protect the health and safety of the Federal workforce with the injunction in place may limit the Federal Government's ability to accomplish critical mission needs, including supporting the American people and combatting the COVID-19 crisis. Third, there are additional costs and harms that the Federal Government will suffer during the pendency of the appeal.

<u>Imperiling the Health and Safety of the Federal Workforce</u>

4.  Delaying implementation and enforcement of a vaccination requirement will imperil the health and safety of the Federal workforce. Relying on guidance from the U.S. Centers for

Disease Control and Prevention (CDC), I understand that the best way to avoid contracting, spreading, and becoming seriously ill with COVID-19 is to be vaccinated. Individuals who remain unvaccinated are at a higher risk of contracting the virus and spreading it to those around them.

5. While most Federal civilian employees are fully vaccinated, hundreds of thousands of them are not vaccinated. Of these unvaccinated employees, tens of thousands do not have a pending or approved request for an exception from the vaccination requirement.

6. Further, over 20,000 federal civilian employees are hired in a typical month. The number of unvaccinated individuals will thus increase as new hires will no longer be subject to a vaccination requirement pursuant to the injunction.

7. In order to limit the additional risk that unvaccinated individuals pose in the workplace, Federal agencies will need to undertake significant mitigation measures that are both more costly and less effective at preventing the spread of COVID-19 in the workplace in the absence of a vaccination requirement. These measures include enforcing masking and physical distancing requirements, and requiring unvaccinated employees to submit to weekly or, if required by their work environment, more frequent testing for infection with SARS-CoV-2, the virus that causes COVID-19.

8. Because those measures are less successful at mitigating the spread of COVID-19 in the absence of a vaccination requirement, it is reasonable to conclude—given the sheer size of the Federal civilian workforce, with millions of employees—that a number of employees will become ill with COVID-19 during the pendency of the injunction who would not have become ill absent the injunction. It is also reasonable to conclude that a number of employees will have close contacts with others with confirmed or probable COVID-19 infections that would not have occurred absent the injunction.

9. These illnesses and close contacts will cause Federal employees, and unvaccinated employees in particular, to isolate and quarantine, consistent with guidance from the CDC, to the

detriment of their ability to perform their typical job functions. Increasing the number of employees who will become ill with COVID-19 and who will have to isolate and miss work as a result—or who will have to quarantine consistent with CDC guidance following close contacts, and will therefore be unable to report to work in-person—will affect the mission capability and critical operations of the Federal Government.

10. Moreover, given that unvaccinated people are at a higher risk for severe disease from a COVID-19 infection, by increasing the number of unvaccinated employees in the Federal workforce, it is reasonable to conclude that more Federal employees will suffer acute and/or chronic health effects, including serious health effects and possibly even death.

Consuming Resources Dedicated to the Federal Government's Mission

11. Second, because the Federal Government will be required to devote considerable additional time and resources (which are finite) to protect the health and safety of the Federal workforce as a result of the injunction (as explained below), agencies' ability to execute on other mission critical programs that agencies should be working on but cannot because they are having to reconsider COVID-19 workplace safety will be undermined. And if the Government prevails on appeal, those resources will not be recouped.

12. For example, Federal agencies will need to revise their workforce safety plans and protocols, in place at each Federal agency and consistent with CDC guidance, to account for the injunction.

13. Agencies were previously directed to plan for how and when to return an increased number of employees in-person to the Federal workplace ("reentry") and intended post-reentry personnel policies and work environment. Agencies spent months drafting and submitting workplace reentry and post-reentry plans to the Safer Federal Workforce Task Force ("Task Force"). These plans have been reviewed by management and health experts on the Task Force, and revised as appropriate. The reentry plans and post-reentry plans reflected the vaccination requirement in Executive Order 14043 with the understanding that all Federal employees, other

than those who are entitled to accommodations on medical or religious grounds, would be vaccinated against COVID-19.

14. Now, in removing the vaccination requirement, agencies will have to expend considerable time and money keeping their entire workforce—both those vaccinated and those unvaccinated—safe. In particular, agencies need to account for numerous challenging issues they would not otherwise need to address, including, for example, development of measures to further protect vaccinated Federal employees who may be immunocompromised, live with high-risk individuals, or are otherwise concerned about working in close proximity with unvaccinated employees, as well as accounting for likely increases in the percentage of Federal employees who are unvaccinated as agencies hire over time and are unable to condition employment on vaccination.

15. Agency COVID-19 workplace safety coordination teams are thus now focused on revising agency COVID-19 workplace safety plans and protocols, as well as revising agency reentry and post-reentry plans and schedules, to account for an increased number of unvaccinated employees who will be in Federal workplaces. That includes, for example, setting up expanded COVID-19 testing programs at agencies and supporting more employees who are unable to work in-person due to COVID-19, either exposure or illness.

16. Additionally, the many changes in Federal employee protocols triggered by needing to account for an increased number of unvaccinated workers in Federal workplaces may require renegotiation with Federal employee union partners. In some cases agencies have finalized negotiations with union partners over implementation of these safety plans, approaches to agency reentry plans, and post-reentry personnel policies and work environment. To the extent any safety plans need to be revised, agencies may be required to expend resources restarting such negotiations and considering with union partners how best to protect the health and safety of a workforce that will be less vaccinated, and therefore less protected against COVID-19.

17. What is more, if the Government prevails on appeal, agencies would not simply be able to go back to where they are today but would need to expend yet further resources. For example, they would need to yet again revise their workplace safety plans and, as needed, renegotiate aspects of those plans with employee unions. Additionally, agencies have already devoted significant resources to establishing systems for collecting and processing exception requests, standing up teams to undertake these efforts, and beginning the actual processing of those requests. Tens of thousands of exception requests are currently pending across the federal government. If processing of exception requests is delayed a significant period of time, resources that agencies have already invested will go to waste as personnel will necessarily be shifted to other responsibilities and plans to process the current set of exception requests will become out of date. Agencies would need to start these processes anew if the vaccination requirement is subsequently allowed to resume, establishing new review teams and developing new plans to reflect the then-current set of exception requests.

18. In sum, each day that the vaccination requirement for Federal employees is delayed requires agencies that provide critical support for U.S. foreign policy, global financial systems, American infrastructure, and the pandemic response to devote additional time and resources to ensuring the safety of the Federal workforce above and beyond the substantial time and resources already devoted to these efforts—time and resources that would otherwise be spent doing critical mission function to the benefit of the American people.

Other Costs

19. There are additional related costs and harms that will be borne by the Federal Government if the vaccination requirement remains enjoined pending appeal.

20. As noted above, without being able to enforce Executive Order 14043, agencies expect many employees will choose to remain unvaccinated, and the percentage of Federal employees who are unvaccinated will likely increase over time. The cost of regular screening testing of unvaccinated employees therefore is expected to increase as a direct result of the injunction

being in place. The Federal Government's COVID-19 workplace safety protocols require unvaccinated employees to submit to regular testing consistent with CDC recommendations that call for multi-layer prevention strategies, including mask-wearing, physical distancing, and testing, to mitigate the spread of COVID-19. Testing is a significant financial cost and, as those testing costs increase, will require agencies to divert funding from other mission critical activities and programs. Increased testing volumes due to an increased percentage of unvaccinated employees will divert taxpayer dollars from other necessary uses. Based on prior estimates, for every 1% of the Federal civilian workforce that Federal agencies need to test weekly for COVID-19 because those individuals are not fully vaccinated, it could cost taxpayers on the order of $1.4 million to $2.7 million per week, and $16 million to $33 million per quarter calendar year. At the time the injunction was put in place, roughly 2% of the overall Federal workforce covered by a vaccination requirement had neither affirmed they were fully vaccinated nor submitted a request for or received an exception. Testing 2% of the total covered Federal workforce weekly could cost taxpayers on the order of $11 million to $22 million each month, or $33 million to $65 million each quarter. The longer these individuals remain unvaccinated and employed in Federal agencies, the more taxpayers costs will increase. Should the percentage of unvaccinated employees increase over time as new hires come aboard, as is expected while the injunction remains in place, agency testing expenses will increase accordingly. These increased screening testing expenses will be on top of the cost of screening testing for those employees with an approved exception.

21.     In addition, in the Federal law enforcement context, while the injunction remains in place, employees who violated a direct order – in that they remained unvaccinated and were either not entitled to a reasonable accommodation or did not request an accommodation – will be allowed to continue to serve alongside those who did follow orders. I understand from federal law enforcement agencies that allowing the continued service of those employees violating orders from their superiors will damage good order and discipline within those vital law

enforcement agencies, harming the collective work of those agencies' workforces and those agencies' ability to meet their vital law enforcement and homeland and national security missions.

22. Finally, the COVID-19 vaccination requirement provides comfort to the vast majority of the Federal workforce by ensuring that their colleagues are vaccinated, protecting their own health and safety. Removing this assurance may negatively impact morale and, in turn, the effective day-to-day performance of the Federal workforce.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on the 28th day of January, 2022.

*/s/ Jason S. Miller*
Jason S. Miller
Deputy Director for Management in the Office of Management and Budget